J-S17017-22
J-S17018-22

2022 PA Super 136

IN THE INTEREST OF: G.R., A    :   IN THE SUPERIOR COURT OF
MINOR                                :       PENNSYLVANIA
                                        :
                                        :
APPEAL OF: K.M., MOTHER       :
                                        :
                                        :
                                        :
                                        :   No. 242 EDA 2022

Appeal from the Order Entered January 12, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000227-2020


IN THE INTEREST OF: G.R. , A    :   IN THE SUPERIOR COURT OF
MINOR                                :       PENNSYLVANIA
                                          :
                                        :
                                        :
APPEAL OF: B.R., FATHER       :
                                        :
                                        :
                                        :
                                        :   No. 370 EDA 2022

Appeal from the Order Dated January 12, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000227-2020

BEFORE: BOWES, J., LAZARUS, J., and STABILE, J.

OPINION BY LAZARUS, J.:                **FILED AUGUST 9, 2022**

    K.M. (Mother) and B.R. (Father) (collectively, Parents) appeal from the

trial court's order reunifying their daughter G.R. (Child) (born August 2019)

with Parents, finding that Child was the victim of child abuse, and concluding

that Mother and Father were the perpetrators of the abuse.[1]  *See* 42 Pa.C.S.A. § 6302; 23 Pa.C.S.A. §§ 6303, 6381(d).[2]  After careful review, we affirm.

On February 12, 2020, Father took then-five-month-old Child to the emergency room at St. Christopher's Hospital where she was treated by Dr. Norell Atkinson, MD, an attending physician in the Department of Pediatrics, Child Protection Section, and an expert in child abuse pediatrics.  Following a skeletal survey, genetic testing, and a full medical examination, Dr. Atkinson diagnosed Child with three acute[3] leg fractures—an oblique right femur (thigh bone) fracture and two lower left leg buckle fractures.[4]

Mother and Father reported to a DHS caseworker that, on the evening of February 10, 2020, while they were getting ready to take Child to paternal grandmother's (M.M.) home, Child had rolled off their bed and onto the

_____

[1] We have *sua sponte* consolidated Mother's and Father's appeals, as the orders appealed and questions involved are essentially the same.  *See* Pa.R.A.P. 513 (consolidation of multiple appeals).

[2] The order also terminated the court's supervision of Child, ended Child's court-ordered services from the county, and discharged Child from Philadelphia Department of Human Services' (DHS) temporary legal and physical custody.

[3] Doctor Atkinson defined an "acute" fracture as a new injury.  *See* N.T. Abuse Hearing, 10/6/21, at 8.

[4] Doctor Atkinson testified that St. Christopher's emergency room doctors would have first stabilized Child and taken x-rays before she was seen by Dr. Atkinson for a full evaluation.  *Id.* at 34.

carpeted floor. Mother and Father also reported that hours after this happened, they took Child to M.M.'s home, where Child stayed for two days while Parents went out of town, and that before leaving for their trip, Parents told M.M. that Child had rolled off their bed and to contact them while they were away if "there was anything different or unusual about her." N.T. Abuse Hearing, 10/6/21, at 11-12. Parents told Caseworker Butler that they had no concerns leaving Child with M.M. *Id.* at 81.

Doctor Atkinson testified that Parents reported while they were away, M.M. never called Parents to tell them that there was anything "different" regarding Child's behavior, *id.* at 12; however, when Parents picked Child up at M.M.'s house on February 12th, they noticed that something was distinctly different about Child's leg. *Id.* at 12 (Doctor Atkinson testifying Father told her he recalled when he picked Child up from M.M.'s home, Child's "leg appeared to be hanging—her right leg appeared to be hanging, and that it looked as if it was broken. . . So, they brought her into the hospital at that point[.]"); *id.* at 69 (DHS case worker testifying Father reported Child's leg looked "flimsy as it was dangling. She looked uncomfortable" when they went to pick her up at M.M.'s house); *id.* (DHS caseworker testifying Mother reported when she touched Child's wrist, Child "tensed up" and when Mother tried to bounce Child on her leg, Child could not put weight on her leg).

Upon picking Child up from M.M.'s, Parents took Child to St. Christopher's. *See id.* at 14 (Doctor Atkinson testifying Child was brought in

by parents to hospital "with a concern that the leg was injured and they were potentially attributing that to the fall"). Doctor Atkinson testified that "[i]t was later . . . reported that a fall [off of the bed] had happened also, in [M.M.'s] care." *Id.* at 21.

Doctor Atkinson was unable to opine as to how or exactly when the injuries occurred.[5] *See id.* at 16 (doctor testifying "given the kind of narrow time frame of three different caretakers over a short period of time, and not being able to precisely say all the fracture is on x-ray, it makes it somewhat difficult to say when exactly the injury was sustained"). Doctor Atkinson, however, testified that Child's leg fractures could not have been sustained, as Parents and M.M. had reported, from falling off of a bed. Doctor Atkinson also opined that Child's injuries did not result from bone abnormalities or genetic diseases, and that they were non-accidental and not self-sustained. *Id.* at 18-22, 29. Doctor Atkinson noted that the most common injury resulting from a short fall from a bed is a skull fracture, not a leg injury, let alone multiple, bilateral leg fractures. *Id.* at 15-16. The oblique fracture Child sustained, Dr. Atkinson opined, most likely occurred from a compression or "twisting or torsional force or bending force to the leg." *Id.* at 9. The other type of

---

[5] Doctor Atkinson testified that although acute fractures are difficult to date, this injury was probably sustained "up to around three days" from when she was diagnosed. *Id.* at 13.

fracture Child sustained, a buckle fracture, is caused by force being applied to either end of the bone. *Id.*

Child's legs were casted and she was placed in a Pavlick harness;[6] Child fully healed within one month. *Id.* at 41. Child had no record or signs of previous injuries and Parents had no prior history with DHS. Child Protective Services (CPS) prepared three reports detailing the alleged abuse inflicted on Child, describing Child's injuries, and listing Mother, Father, and M.M. as alleged perpetrators of the abuse.[7] On February 14, 2020, DHS obtained an order of protective custody (OPC) for Child. Child was discharged from the hospital and placed in temporary care with her maternal grandmother, E.M.

After a February 17, 2020 shelter care hearing, the trial court found it was not in Child's best interest to return Child to Parents' care and that to allow Child to remain in Parents' home would be contrary to her welfare. However, Parents were granted supervised visitation with Child. On February 21, 2020, DHS filed a petition alleging that Child was a dependent child and the victim of child abuse. *See* 42 Pa.C.S.A. § 6302; 23 Pa.C.S.A. § 6303.

---

[6] "A Pavlik Harness is a device used . . . for babies with a broken femur (thigh bone). The harness helps to keep the bone in position while it heals." https://cdn.ymaws.com/www.apsna.org/resource/resmgr/Teaching_Sheets_PDF_2015/Pavlick_Harness.pdf (last visited 6/29/22).

[7] In one of those CPS reports, dated March 2020, M.M. was added as an alleged perpetrator of Child's abuse. N.T. Abuse Hearing, 10/6/21, at 50-52.

- 5 -

Following a hearing held on October 7, 2020, Child was adjudicated dependent and legal custody of Child was transferred to DHS.

After a March 26, 2021 permanency review hearing, Child remained in kinship care with E.M., but Parents were granted unsupervised visitation, with overnight visits by agreement of the parties. The court continued the child abuse hearing until M.M. was appointed counsel. On July 14, 2021, the court granted Parents liberal, unsupervised and weekend overnight visits. DHS found the report of child abuse to be indicated with regard to Parents and M.M.

On October 6, 2021, and January 12, 2022, child abuse hearings were held before the Honorable Vincent Furlong. At the October 6, 2021 hearing, Dr. Atkinson, DHS Intake Worker/Investigator, Jaabir Butler, and Community Umbrella Agency (CUA) case manager Carolyn Smith testified. Neither Mother, Father, nor M.M. testified. At the conclusion of the CUA case manager's testimony, Child was reunited with Parents.

On January 12, 2022, Judge Furlong stated that he found DHS' witnesses credible, N.T. Abuse Hearing, 1/12/22, at 5, that clear and convincing evidence existed to prove that Child was a victim of child abuse, and that Mother and Father were the perpetrators of the abuse. *Id.* at 5-6.[8]

_____

[8] The court concluded that DHS had not proven its case against M.M. and, therefore, did not find that she was perpetrator of Child's abuse. *Id.* at 9-10.

The case was discharged, and Father and Mother were referred to aftercare services. *Id.* at 7, 11.[9]

On appeal, Mother presents the following issue for our consideration: "Did the [trial] court err by making a finding of abuse as to Mother where 'clear and convincing evidence' was not provided, that Mother, either directly or by neglect[,] caused injuries to [C]hild, as required by [23] Pa.C.S.A. § 6381(d) and 23 Pa.C.S.A. § 6303?"  Mother's Brief, at 6.  Father presents a similar question for our appellate review:  "Whether the trial court abused its discretion and erred as a matter of law when it found that [DHS] had met its burden of proof by clear and convincing evidence that Father had committed [c]hild [a]buse."  Father's Brief, at 7.

We review this appeal for an abuse of discretion.  ***In the Interest of L.Z.***, 111 A.3d 1164, 1174 (Pa. 2015).  "The standard of review in dependency cases 'requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law.'" ***Id.*** (citation omitted).

---

[9] Since the date of the first abuse hearing on October 6, 2021, Child has been returned to Parents and is currently living with them.

"[Although] dependency proceedings are governed by the Juvenile Act (Act),[10] . . . the C[hild] P[rotective] S[ervices] L[aw] [(CPSL)][11] . . . controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence." *In re L.V.*, 209 A.3d 399, 417 (Pa. Super. 2019) (citations omitted; footnotes added); *see also In the Interest of X.P.*, 248 A.3d 1274, 1276 (Pa. Super. 2021) (same).  The CPSL "does not provide for legal determinations of abuse; it is mainly a vehicle for reporting abuse and bringing quickly into play those services (including court hearings) available through county protective service facilities for the care of the child."  *In the Interest of J.R.W.*, 631 A.2d 1019, 1022 (Pa. Super. 1993).  "[T]he Act and the [CPSL] must be applied together in the resolution of child abuse complaints under the [CPSL and] reference must be made to the definition sections of both the [Act] and the [CPSL] to determine how that finding [of child abuse] is interrelated." *Id.* at 1023.

"'As part of [a] dependency adjudication, a court may find a parent [or caregiver] to be the perpetrator of child abuse[]' as defined by the . . . CPSL." *In re S.L.*, 202 A.3d 723, 728 (Pa. Super. 2019) (citation and quotations omitted).  Section 6381 of the CPSL, which governs evidence in court

---

[10] 42 Pa.C.S.A. §§ 6301-6475.

[11] 23 Pa.C.S.A. §§ 6301-6387.

proceedings, states that "[i]n addition to the rules of evidence . . . relating to juvenile matters, the rules of evidence in this section shall govern in child abuse proceedings in court[.]" 23 Pa.C.S.A. § 6381(a). Specifically, section 6381(d) "provides for an 'attenuated' standard of evidence in making a legal determination as to the abuser in child abuse cases [where] a child has suffered serious physical injury . . . as would ordinarily not be sustained or exist except by reason of the **acts or omissions** of the parent or other person responsible for the welfare of the child." *J.R.W.*, *supra* at 1023; 23 Pa.C.S.A. § 6381(d) (emphasis added).

In *In the Interest of N.B.-A.*, 224 A.3d 661 (Pa. 2020), the Pennsylvania Supreme Court recently reiterated the appropriate standard of proof for a finding of child abuse:

> The requisite standard of proof for a finding of child abuse pursuant to [s]ection 6303(b.1) of the CPSL is clear and convincing evidence. [A] petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations, 42 Pa.C.S.[A.] § 6341(c)[]. Clear and convincing evidence is "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." [] However, in certain situations, the identity of the abuser need only be established through *prima facie* evidence. As an appellate court, we are required to accept the findings of fact and credibility determinations of the trial court, if they are supported by the record; however, th[is] [C]ourt is not bound by the lower court's inferences or conclusions of law.

*Id.* at 668 (citations omitted).

Section 6381(d) of the CPSL establishes a rebuttable, evidentiary presumption when a child sustains abuse not ordinarily suffered absent acts or omissions of a parent or other responsible party. Under such circumstances, "the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible." *In the Interest of L.Z.*, *supra* at 1167.[12] *See id.* at 1184 ("The Legislature [] carved out a very limited exception to these more stringent evidentiary standards, allowing for the possibility of identifying the perpetrator of abuse based on *prima facie* evidence in cases where the abuse is "'of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent[.]'").

Under section 6381(d), a parent or other responsible caregiver may rebut the *prima facie* presumption with evidence:

> [d]emonstrating that the parent or responsible person did not inflict the abuse, potentially by testifying that they gave

---

[12] Section 6381(d) provides:

> **(d) *Prima facie evidence of abuse.*** — Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S.A. § 6381(d).

responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by . . . [DHS] . . . and the rebuttal of the parent or responsible person.

*Id.* at 1185. *See id.* at 1176 n.15 (section 6381(d) presumption may be rebutted with evidence that parent or responsible person was absent at time of injury and not otherwise responsible for injury by failing to secure proper care for child); *see also In re S.L.*, 202 A.3d 723, 728 (Pa. Super. 2019) (section 6381(d) presumption "can be rebutted, like other statutory presumptions, with countervailing competent, substantial evidence") (citations omitted).

Instantly, Mother asserts that DHS failed to prove by clear and convincing evidence that she either "directly or indirectly" caused the child abuse where Child was not in Mother's care when the injuries occurred. Mother's Brief, at 11. Specifically, Mother contends that there was circumstantial, corroborative evidence to support Mother's claim that Child did not have any broken bones prior to Child being placed in M.M.'s care, where Child was not in any distress when she left Parents' care and Child's injuries and pain would have been obvious to Parents.

"*Prima facie* evidence is not the standard that establishes the child has been abused[.]" *C.B.*, *supra* at 771, citing *In the Interest of L.Z.*, *supra* at 1024. Rather, the fact of child abuse must be proven by clear and

- 11 -

convincing evidence. Here, DHS met its burden when Dr. Atkinson testified Child's three acute oblique and buckle leg fractures were non-accidental, not self-sustained, and not the result of any bone abnormalities or genetic disorders. Moreover, Dr. Atkinson opined that a reasonable caregiver would have noticed Child's symptoms, which would have included crying and fussiness, and that Child "would be crying with a diaper change" and generally uncomfortable with the type of injuries she sustained. N.T. Child Abuse Hearing, 10/6/21, at 12, 37-38, 46; *id.* at 23 ("It should have been painful to her.").

The record evidence demonstrates that Child, at five months of age, suffered leg injuries that "would ordinarily not be sustained or exist except by reason of the acts or omissions of" Parents or M.M., who were responsible for Child's welfare from February 10, 2020, through February 12, 2020. *See* 23 Pa.C.S.A. § 6381(d). Doctor Atkinson opined that, given the "narrow time frame" of when the injury could have been sustained (three days to a week prior), Child's injury could have occurred in either Parents' or M.M.'s care. N.T. Abuse Hearing, 10/6/21, at 14, 25; *id.* at 21 (doctor testifying fact that second fall occurred in M.M.'s care "creates another level of unclearness as to where the injury could have been sustained"). Doctor Atkinson also clearly indicated that the type of fractures Child sustained would **not** have been caused by a fall from a bed, which allegedly happened to Child while in the care of both Parents and M.M. *See In the Interest of L.Z.*, *supra* at 1167

("the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible"). Given the timeframe in which Child's injuries occurred, and the type of injuries Child sustained, both of which were established by medical testimony, we conclude that the trial court properly determined Child suffered abuse and applied the section 6381(d) presumption to Parents and M.M.

Next, we must assess whether Parents sufficiently rebutted the section 6381(d) *prima facie* presumption with evidence "[d]emonstrating that the[y] did not inflict the abuse . . . [through] testifying that they gave responsibility for [C]hild to [M.M.] . . . about whom they had no reason to fear." **In the Interest of L.Z.**, 111 A.3d at 1185. **See In re S.L.**, 202 A.3d 723 (Pa. Super. 2019) (finding of *prima facie* evidence against parent pursuant to section 6381(d) "does not end the analysis;" due process dictates parent entitled to present rebuttal evidence). In assessing this rebuttal evidence, we keep in mind that the trial court evaluates the credibility of the evidence presented when considering the validity of the section 6381(d) presumption and any rebuttal evidence proffered by Parents. **In the Interest of L.Z.**, **supra** at 1185.

DHS states that "[n]either Mother, Father, nor M.M. appeared or provided rebuttal evidence," Appellee's Brief, at 11 (citing N.T. Abuse Hearing, 1/12/22, at 5), claiming that Parents did not rebut the presumption "because [they] opted not to present any evidence." Appellee's Brief (for Father's

Appeal), at 13; *id.* (for Mother's Appeal). We find ***In the Interest of L.Z.***, ***supra***, instructive on this issue.

In ***L.Z.***, an abused child's mother and maternal aunt were the child's primary caregivers with whom child resided. Neither the mother nor the aunt testified at the adjudicatory/abuse hearing. Rather, like in the instant case, the sole witnesses at the hearing were a DHS social worker and the doctor who examined the child at the hospital for his injuries. The DHS worker testified that she met with the child's mother, who told the caseworker that she had been residing with her boyfriend for the two days prior to the incident and that Mother had not seen child since that time. ***Id.*** 111 A.3d at 209-10. Mother also told the DHS caseworker that she was unable to explain one injury and said that the other injury was the result of a fall when child hit his face on a table. The doctor testified that the child was a victim of child abuse, that his injuries were non-accidental in nature, that one of the injuries (penile laceration) would have caused "severe pain," and that the explanations for the injuries given by mother and aunt "did not seem plausible." ***Id.*** at 210, 215.

Ultimately, the juvenile court adjudicated child dependent, found child was the victim of abuse and that aggravating circumstances existed, and concluded that mother, pursuant to section 6381(d), was the perpetrator of that abuse. On direct appeal, our Court reversed the finding that mother was the perpetrator of child's abuse, concluding that mother neither knew nor

should have known that child was being abused because child was not in mother's care at the time child sustained the injury.[13]

The Supreme Court granted review to consider whether our Court "exceeded its scope and standard of review in substituting its judgment for that of the trial court in determining whether the child at issue in this case suffered abuse and whether that abuse was perpetrated by his mother." *Id.*, 111 A.3d at 1166. The Supreme Court reversed, holding that application of the section 6381(d) presumption is not limited to cases where, at the time the child abuse occurs, the child is in the caretaker's/parent's care. In so holding, the Court found that mother **was** a perpetrator of abuse. Notably, the *L.Z.* Court found that mother failed to rebut the section 6381(d) presumption, stating:

> Applying Section 6381(d) as set forth above to the case at bar, we affirm the trial court's determination that [m]other perpetrated the abuse in the form of the laceration, the cheek bruising, and the severe diaper rash and yeast infection. First, because the medical evidence presented by DHS demonstrated that [c]hild's injuries were neither accidental nor self-inflicted and because [c]hild was only in the care of [m]other and [a]unt, the injuries were shown to be "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the

---

[13] Our Court, on direct appeal, considered only a penile laceration, not the cheek bruises or diaper rash and yeast infections, to be abusive injuries. However, on discretionary review, the Supreme Court "affirm[ed] the trial court's determination that [m]other perpetrated the abuse in the form of the laceration, **the cheek bruising, and the severe diaper rash and yeast infection**." *Id.* at 1185-86 (emphasis added).

parent or other person responsible for the welfare of the child[.]"
23 Pa.C.S. § 6381(d). Ergo, either [a]unt or [m]other or both
inflicted the abuse [c]hild suffered or failed to protect him from
the other's abuse. **Mother failed to rebut the presumption by
presenting evidence or testimony from her, [a]unt, or her
boyfriend establishing that [c]hild was not in her care when
the injuries were suffered and that she had no reason to
question her decision to leave [c]hild in [a]unt's care.
Likewise, neither [a]unt nor anyone on her behalf testified.
Mother and [a]unt's self-serving claims made at the
hospital were neither under oath nor subject to cross-
examination. They were outside-the-record and do not
constitute rebuttal evidence.**

**Instead, ample, uncontested, unrebutted evidence existed
for the trial court to presume that [m]other perpetrated
abuse on Child.** In regard to the diaper rash, it was put into
evidence that [m]other acknowledged to the hospital staff her
awareness of the condition and blamed it on weeks of diarrhea.
D[octor] Silver testified rejecting [m]other's extrajudicial
contention because the rash was on the front of [c]hild's body,
indicative of prolonged contact with urine, rather than on the
buttocks, which would have been consistent with diarrhea. Thus,
the trial court was well within its discretion and fully supported by
the record when it properly concluded that [c]hild suffered
physical neglect as a result of the severe diaper rash and yeast
infection due to his caregivers' failure to change his diaper (or to
obtain medical treatment).

Additionally, **the trial court did not abuse its discretion in
discrediting [m]other's implausible out-of-court
explanation and instead crediting the treating doctor's
testimonial determination that the cheek bruising was
classic child abuse**. The court found Dr. Silver credible given
the pattern of bruises showing that someone squeezed [c]hild's
face between her thumb and fingers, bruising which could have
occurred during the window of time [m]other acknowledged
having control of [c]hild and bruising that the doctor testified
would have caused [c]hild severe pain. Moreover, **even
assuming [m]other did not inflict the penile laceration or
the cheek bruising, she is still responsible for [c]hild's
injuries by failing to protect him from [a]unt, absent**

> **rebuttal from [m]other that she had no reason to fear leaving [c]hild with [a]unt.**
>
> We conclude that the presumption of [s]ection 6381(d) is applicable to this case and that [**m**]**other offered no testimony to rebut it**. Thus, the trial court properly found [m]other perpetrated the abuse on [c]hild either by inflicting the injuries or failing to protect [c]hild from [a]unt. Accordingly, we reverse the decision of the Superior Court and reinstate the trial court's order.

*Id.* at 1185-86 (emphasis added).

The *L.Z.* Court also pointed out that the Superior Court "essentially [] made a finding of fact . . . [based on] the facts[,] as [m]other and [a]unt supplied them to the case[]worker at the hospital[,] as if there were no dispute regarding their truth, even though neither [m]other nor [a]unt testified at the hearing and the hospital staff and trial judge found their assertions regarding [c]hild's injuries implausible." *Id.* at 1176.

Given the Supreme Court's conclusion in *L.Z.* that mother's and aunt's statements to a DHS caseworker and treating doctor are not considered rebuttal evidence, we similarly cannot rely on the statements that Mother and Father made to DHS Caseworker Butler and Dr. Atkinson to make factual findings for purposes of determining whether Mother and Father rebutted the section 6381(d) presumption that they are perpetrators of abuse. Rather, where the trial court deemed DHS' witnesses credible, Mother and Father did not testify, and no rebuttal witnesses were presented to offer countervailing testimony, we are constrained to affirm the trial court's determination.

Here, Mother's and Father's attorneys simply examined DHS' witnesses at the abuse hearing. Accordingly, DHS was not provided the opportunity to cross-examine any information that Mother and Father may have given to caseworkers or medical staff about the underlying incident. As such, Mother and Father have failed to rebut the presumption with "countervailing competent, substantial evidence." *In re S.L.*, *supra* at 728. **See also In the Interest of L.Z.**, *supra* at 1185 ("[*P*]*rima facie* evidence is '[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, **and which if not rebutted or contradicted**, will remain sufficient.'"), citing Black's Law Dictionary 825 (6th ed. abridged 1991); **see also In re S.L.**, **supra** at 730 (in section 6381(d) rebuttal evidence case, noting relevant evidence "has a 'tendency to make a fact [that is of consequence to the determination of the action] more or less probable than it would be without the evidence.'").[14]

_____

[14] Although M.M. is not a party to this appeal, we take issue with the trial court's conclusion that Child's "injury was noticed by [F]ather prior to [C]hild going to [M.M.'s] . . . so I'm not making a finding against [M.M.]." N.T. Abuse Hearing, 1/12/22, at 9. **See In the Interest of L.Z.**, **supra** at 1174 ("With respect to findings of fact and credibility determinations of the trial court, the standard of review in dependency cases requires an appellate court to accept
*(Footnote Continued Next Page)*

Order affirmed.[15]


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/9/2022

_____


them 'if they are supported by the record[.]'").  While the record supports the fact that Child was abused, the witnesses, whom the trial judge found credible, testified that Child's injuries occurred sometime during a three-day-to-one-week window— when Child was in the care of **both** Parents and M.M—and that they were unable to determine exactly at what point within that window Child was injured.  Thus, because the trial court did not find M.M. to be a perpetrator of abuse, she is not an aggrieved party, and we are precluded from making any findings with regard to M.M. on appeal.  However, we would note that the same factual record supports the trial court's findings regarding the allegations of abuse with regard to M.M. as it does to Parents.  Instantly, because Parents failed to present rebuttal evidence, **see L.Z.**, **supra**, we are constrained to affirm their perpetrator status.

[15] Although M.M.'s attorney tried to elicit testimony from DHS Caseworker Butler about information contained in St. Christopher's Emergency Department consultation notes, the trial judge specifically excluded the evidence.  **Id.** at 82-83, 85.  **See** 42 Pa.C.S.A. § 6151 (copies of medical charts or records of licensed Commonwealth health care facility only admissible if "proved as to foundation, identity and authenticity," if certified properly by employee of health care facility charged with custodial responsibility of originals).

- 19 -